**NOT FOR PUBLICATION**

FILED
JAMES J. WALDRON, CLERK
NOV 25 2015
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY _____ DEPUTY

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| In Re: Gregory M. DeCastro, Debtor. | Case No.: 14-15597-ABA <br> Adv. No.: 14-01581-ABA |
| Donna Renella, Plaintiff <br><br> v. <br><br> Gregory DeCastro, Defendant. | Chapter: 7 <br><br> Judge: Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

This matter is before the court by way of an adversary proceeding seeking a determination of nondischargeability of the Plaintiff's claim against the Defendant pursuant to section 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code. A discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt for money obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). A discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or the property of another entity. 11 U.S.C. § 523(a)(6). The court concludes that the Plaintiff has not met her burden with regard to her claims and therefore the claims are dischargeable.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

The Complaint in this Adversary Proceeding (Doc. No. 1) was filed with the court on June 24, 2014 by Donna Renella (hereinafter "Ms. Renella" or "Plaintiff"), as Plaintiff, against

Debtor Gregory DeCastro (hereinafter "Mr. DeCastro" or "Defendant"), as Defendant. Ms. Renella seeks a determination of nondischargeability of her claim against Mr. DeCastro pursuant to 11 U.S.C § 523(a)(2)(A). Alternatively, she seeks nondischargeability pursuant to 11 U.S.C. § 523(a)(6), arguing that Debtor's actions constituted conversion.[1] Mr. DeCastro timely filed his Answer to the Complaint on July 25, 2014 (Doc. No. 3). The trial was ultimately scheduled for June 3, 2015.

On June 3, 2015, Ms. Renella and her counsel appeared. Mr. DeCastro did not. The court allowed Ms. Renella to put her case on. During the trial, the court raised concerns about Ms. Renella's claim for conversion under section 523(a)(6) in her Complaint. The court advised counsel that it was not satisfied that there was a conversion. Counsel was given the opportunity to further convince the court that there was a conversion. *See* Doc. No. 15, transcript p. 74, l. 12 – p. 75, l. 23.

After the trial it came to the court's attention that Mr. DeCastro had accidently put the wrong trial date in his calendar thereby causing him to miss the trial. In addition, because the court had questions about some facts at trial, Ms. Renella submitted further evidence for the court to consider. In light of the apparent confusion as to the trial date, the questions raised and Mr. DeCastro's prior active participation in this case, the court, pursuant to Federal Rules of Civil Procedure Rule 59(a)(2) (made applicable to this proceeding through Fed. R. Bankr. P. 9023), section 105(a) of the Bankruptcy Code, and the Third Circuit's mandate in *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) ("our preference that cases be disposed of on the merits whenever practicable."), reopened the record to give Mr. DeCastro the opportunity to appear, present his case, and cross-examine the plaintiff's witnesses. The reopened trial took place on August 27, 2015.

Following the trial, the court took this matter under advisement and ordered post-trial submissions. The last post-trial submission, Defendant's "Exhibit X" regarding a $5,000 Loan, was filed on September 30, 2015. (Doc. No. 19). This matter is now ripe for disposition.

## FINDINGS OF FACT[2]

The court was impressed by Ms. Renella. She is a strong and sophisticated business person. Ms. Renella earned her master's degree in quantitative economic analysis and owns a public relations and human resources consulting business.

---

[1] The Complaint also sought a determination of nondischargeability pursuant to section 523(a)(4), but the Plaintiff abandoned that cause of action prior to trial and as such, the claim is denied.

[2] In making its decision, the court has reviewed the pleadings submitted by the parties, the recordings of the hearings in this matter, the testimony of the parties and the trial exhibits admitted into evidence.

During the relevant portions of 2004 through 2006, Mr. DeCastro was involved in a romantic relationship with Christine ("Chrissy") Renella (hereinafter "Chrissy"). Ms. Renella is Chrissy's loving aunt. Mr. DeCastro admits that Chrissy and Ms. Renella enjoy a very close relationship.

**The $10,000 Loan**

In December of 2004, Mr. DeCastro called Ms. Renella and requested that she accompany him to purchase an engagement ring for Chrissy at Chrissy's godfather's jewelry store on Long Island. This news did not come as a surprise to Ms. Renella, as Ms. Renella and Chrissy had previously discussed the anticipated engagement and looked at engagement rings at Tiffany's. Additionally, Mr. DeCastro had already asked Chrissy's father (Ms. Renella's brother), Damien Renella, for his daughter's hand in marriage. Mr. DeCastro and Chrissy also looked at engagement rings together.

Ms. Renella agreed to accompany Mr. DeCastro to the jeweler on Long Island, but Mr. DeCastro then explained that he did not have the money for the ring. Mr. DeCastro asked to borrow $10,000 from Ms. Renella to purchase the engagement ring in anticipation of the Christmas holiday. Ms. Renella agreed because she wanted her niece to be happy with the ring for Christmas and thought she was going to go with him to purchase the ring. However, before the arranged trip to Long Island to see the jeweler, Mr. DeCastro relayed to Ms. Renella that he decided to get the ring from another jeweler. Ms. Renella was "really hesitant," but lent him the money anyway.

In early December 2004, Mr. DeCastro went to the bank with Ms. Renella and she gave him $10,000 in cash (the "$10,000 Loan"). Mr. DeCastro told her at that time that the purpose of the loan was to purchase the ring for Chrissy. Ultimately, Mr. DeCastro did not purchase a ring for Chrissy. Instead, Mr. DeCastro claims that he used a portion of the $10,000 Loan to pay rent and expenses, and once he was short on the ring purchase amount, he turned to gambling at the OTB race track in Philadelphia in an attempt to replace the funds. Mr. DeCastro admits that at all times relevant hereto, he had a gambling addiction. *See* Doc. No. 1, ¶ 10 and Doc. No. 3, ¶ 3 and Doc. 18, p. 2). No evidence of a gambling addiction or gambling track record was otherwise introduced. Mr. DeCastro stated that his intent always was to purchase an engagement ring, but by December 22nd, the proceeds from the $10,000 Loan were gone.

**Post $10,000 Loan Events**

After Christmas, Mr. DeCastro and Chrissy's relationship became strained when Chrissy discovered that Mr. DeCastro had deposited checks into her account and then withdrew the money, essentially over drafting Chrissy's account.[3] As a result of the overdrafts, Chrissy filed a criminal complaint or complaints against Mr. DeCastro. Ultimately, Mr. DeCastro was enrolled into the Pretrial Intervention Program, also known as "PTI." As the court understands it, Mr. DeCastro and Chrissy then separated.

---

[3] Mr. DeCastro does not recall whether he had his own banking accounts in 2004.

But in April of 2005, Chrissy and Mr. DeCastro got back together. When Ms. Renella learned of this, she told Chrissy that she was "making a major mistake" and told Mr. DeCastro that she was "against it" and "wouldn't support it." However, Ms. Renella also testified that ultimately she feared that if she did not support the relationship, she was going to lose her niece.

### The $1,900 Loan

On February 24, 2006, Mr. DeCastro requested to borrow $1,900 to "clear up his problem." (Plaintiff's Ex. A) and Ms. Renella complied. Mr. DeCastro testified, without challenge, that the $1,900 Loan was for fees associated with PTI and that he paid those fees. He testified that because of this payment, DeCastro was permitted to move to Florida. However, in March of 2007, Mr. DeCastro was involved in criminal activity again, which caused Mr. DeCastro to not successfully complete the PTI program.

Thereafter, on April 30, 2006, Mr. DeCastro sent an email to "Aunt Joanie and Uncle Michael" (Ms. Renella's sister) requesting a $15,000.00 loan to "get the ring, move to Florida with Chrissy in August as we planned, and be in a somewhat solid financial position." (Plaintiff's Ex. C). Mr. DeCastro claims that Joanie and Michael declined to loan him the money.

### The $5,000 Loan

On May 23, 2006, Mr. DeCastro sent an email to Ms. Renella asking to borrow $7,500.00. (Plaintiff's Ex. B). Plaintiff's Exhibit B is actually a chain of emails starting on May 26, 2006 and ending on May 29, 2006. While Mr. DeCastro testified that he did not recall the purpose behind the request for the loan, a review of the entire email chain reveals that he had stated that the purpose of the loan was due to a "build up of bills" and "[l]astly, a good majority of the amount was indeed for Damien and Chrissy. The 5k to which I mentioned is for them."

Ms. Renella claims that she loaned Mr. DeCastro $5,000 in cash in response to his May of 2006 email request. Ms. Renella testified that she lent $5,000 to Mr. DeCastro because she was fearful that Mr. DeCastro's financial situation would put her niece in danger. In Mr. DeCastro's May 29, 2006 email to Ms. Renella, he assured her that "I am, however, in no trouble nor in danger of any prosecution of any kind," and "My debt is legitimate and I am certainly in no danger of being hurt." Plaintiff's Ex. B. More importantly, Mr. DeCastro claims that he did not receive the $5000 Loan from Ms. Renella. In response, Ms. Renella walked the court through her check book ledger detailing how the proceeds for $5,000 Loan were gathered to pay Mr. DeCastro in cash.

### The Florida County Court Action

After having a private detective locate him, Ms. Renella sued Mr. DeCastro in the County Court for Broward County, Florida for nonpayment of debt. In May of 2007, Mr. DeCastro and Ms. Renella entered into a Stipulation for Installment Settlement and Stay Agreement (the "Settlement Stipulation"), which provided that Mr. DeCastro was indebted to Ms. Renella in the

sum of $13,900 (Doc. 9).[4] Ms. Renella signed the Settlement Stipulation. The Settlement Stipulation was approved by the County Court on June 5, 2007.

On February 6, 2008, the Florida County Court entered a judgment against Mr. DeCastro in the amount of $16,400 for failure to "remit payments as required under the Settlement Stipulation." (Plaintiff's Ex. F). The judgment does not explain how the amount of $16,400 was calculated.

## I. DISCUSSION

Ms. Renella seeks a determination of nondischargeability of her claim for fraud against Mr. DeCastro pursuant to 11 U.S.C § 523(a)(2)(A). Alternatively, she seeks nondischargeability pursuant to 11 U.S.C. § 523(a)(6), arguing that Mr. DeCastro's actions constituted conversion.

### A. Nondischargeability under section 523(a)(2)

A fundamental purpose of the Bankruptcy Code is to permit an honest debtor to adjust his or her financial affairs and obtain a "fresh start" free from the weight of oppressive, preexisting debt. *See, e.g., In re Cohn*, 54 F.3d 1108, 1113 (3d Cir.1995 ). As such, the provisions of section 523(a) are "strictly construed against creditors and liberally construed in favor of debtors". *Id.* Nondischargeability under section 523 must be established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). To prevail on a complaint brought under section 523(a)(2)(A), a creditor bears the burden of proving the following elements:

> (1) the debtor obtained money, property or services through a material misrepresentation;
> (2) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth;
> (3) the debtor intended to deceive the creditor;
> (4) the creditor [justifiably] relied on the debtor's false representations; and
> (5) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations.

*In re Karpo*, No. 09-38892/JHW, 2011 WL 3034486, at *6 (Bankr. D.N.J. July 22, 2001) (citing *In re Cohen*, 191 B.R. 599, 604 (D.N.J. 1996), aff'd, 106 F .3d 52 (3d Cir. 1997), aff'd, *Cohen v. de la Cruz*, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed.2d 341 (1998) (internal citations omitted)). Failure to prove any one of the five elements is fatal to the creditor's nondischargeability case. *In re Reynolds*, 221 B.R. 828, 834 (Bankr. N.D. Ala. 1998).

As for false representations or false pretenses, the court stated in *In re Reath*, 368 B.R. 415, 422 (Bankr D.N.J. 2006):

---

[4] The Settlement Stipulation does not explain how the amount of $13,900 was calculated.

A false representation or false pretense involves: "(1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party." *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995). "'As distinguished from false representation, which is an express misrepresentation[,] false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression.'" *In re Brandon*, 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002) (quoting *In re Weinstein*, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983)).

*Reath*, 368 B.R. at 422.

The court will address each loan complained of separately.

### 1. The $10,000 Loan

It is undisputed that Ms. Renella made the $10,000 Loan to Mr. DeCastro. It is also undisputed that the express purpose and intent of that first loan was for Mr. DeCastro to use the loan proceeds to purchase an engagement ring for Chrissy. After receiving the $10,000 Loan, Mr. DeCastro never shopped or purchased an engagement ring. Instead, Mr. DeCastro claims that, within a two to three week period, he used the $10,000 Loan to pay rent and expenses, and turned to gambling in attempt to replace the funds. Mr. DeCastro never repaid the $10,000 Loan.

On these facts, there is no question that Ms. Renella justifiably relied on Mr. DeCastro's statement that he wanted a loan of $10,000 to purchase an engagement ring for Chrissy. Had it not been for the express promise to buy the engagement ring for Chrissy, Ms. Renella would not have given Mr. DeCastro the $10,000 Loan. Prior to the $10,000 Loan, Mr. DeCastro had involved Ms. Renella in the engagement process and requested the $10,000 Loan from her. Ms. Renella, while admittedly hesitant, did not have any reason to believe that Mr. DeCastro would not use the loan proceeds for their intended purpose or that he would not pay the $10,000 Loan back in full.

In addition, when Mr. DeCastro did not use the loan proceeds to purchase the engagement ring, but rather utilized the proceeds for other personal purposes, Ms. Renella sustained a loss. The proceeds of the loan were gone and there was no ring and the $10,000 Loan has not been paid back.

What is not clear is whether Mr. DeCastro made a material misrepresentation on which he intended Ms. Renella to rely. Intent is determined as of the time the alleged misrepresentation was made. *In re August*, 448 B.R. 331, 350 (Bankr. E.D. Pa. 2011). As noted by the court in *In re Giquinto*, 388 B.R. 152 (Bankr. E.D. Pa. 2008):

> Intent is a required element of § 523(a)(2)(A). *See, e.g., In re Ojeda*, 2008 WL 1883221, at *11 (Bankr. N.D. Ill. Apr. 22, 2008) ("[a]ny cause of action under §

523(a)(2)(A)—false pretenses, false representation, or actual fraud—requires proof that the debtor acted with intent to deceive"). Determining whether a debtor had the requisite fraudulent intent to warrant an exception to discharge is a subjective inquiry. *166 *Field v. Mans,* 516 U.S. 59, 70–72, 116 S. Ct. 437, 444, 133 L. Ed.2d 351 (1995). A creditor may prove such fraudulent intent by direct, as well as circumstantial, evidence. "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *In re Ojeda,* 2008 WL 1883221, at *11 (citation omitted). Intent and knowledge may be inferred based on the "totality of the circumstances." *See In re Cohn,* 54 F.3d at 1118–19. Finally, "[t]o be actionable, the debtor's conduct must involve moral turpitude or intentional wrong: mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." *In re Schwartz & Meyers,* 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991).

*Giquinto,* 388 B.R. 152, 165-66 (Bankr. E.D. Pa. 2008). However, it is rare that a debtor will admit to fraudulent intent. As a result,

[a]s direct evidence is seldom available, fraudulent intent normally is determined from the totality of the circumstances. *Charlie Kelton's Pontiac, Cadillac, Oldsmobile & Isuzu Truck, Inc. v. Roberts (In re Roberts),* 82 B.R. 179, 184 (Bankr. D. Mass. 1987). And since "subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent" at the time the promise was made, proper application of the "totality" test in the instant context often warrants consideration of post-transaction conduct and consequences, as well as pre-transaction conduct and contemporaneous events. *See Krenowsky v. Haining (In re Haining),* 119 B.R. 460, 464 (Bankr. D. Del. 1990); *cf. United States v. Rodriguez,* 858 F.2d 809, 816 (1st Cir. 1988) ("later events often may shed light on earlier motivations").

*Williamson v. Busconi,* 87 F.3d 602, 603 (1st Cir. 1996). *See also In re Rahrig,* 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007):

Of particular evidentiary weight in this regard, . . . is whether the debtor undertook any of the steps necessary to perform as promised. In this way, a type of inverse relationship can be found. On the one side, a debtor acting with intent to defraud will usually not undertake any significant measures toward the performance of their obligation. Conversely, the opposite is also logically true—when a debtor undertakes significant steps to perform as promised, inferences of fraud are muted."

*Id.* at 834.

In this case, there is no direct evidence of Mr. DeCastro's intent *at the time* he obtained the $10,000 Loan. A careful review of the circumstantial evidence, including pre- and post-loan conduct reveals that Mr. DeCastro's subsequent conduct after obtaining the $10,000 Loan is

suspect. The proceeds of the loan were not used for their intended purpose but rather for personal expenses he might have known of at the time of requesting the loan and for gambling.

On the other hand, it is undisputed that Mr. DeCastro asked Chrissy's father for his daughter's hand in marriage. In connection therewith, Mr. DeCastro initially requested Ms. Renella to be involved with the purchase of the engagement ring at her jeweler. Ms. Renella and Chrissy had previously discussed the anticipated engagement and looked at engagement rings at Tiffany's. Mr. DeCastro and Chrissy also looked at engagement rings together. It is clear that an engagement was anticipated by Christmas 2004. The court believes that this pre-loan conduct is evidence of significant steps, as well as significant measures toward the performance of Mr. DeCastro's stated intention. As a result, the inferences of fraud are muted. It is inconceivable to the court that the Debtor undertook such significant steps as part of a ruse to obtain the $10,000 Loan. The court simply is not convinced that Mr. DeCastro had the requisite intent *at the time* he requested the $10,000 Loan.

Ms. Renella cites, *inter alia*, In re McCoy, 269 B.R. 193 (Bankr. W.D. Tenn. 2001), in support of her position. While at first glance *McCoy* appears similar to this case, it is not.[5] In *McCoy*, a debtor obtained a loan to purchase horses. Despite that intention, the debtor testified that several post-loan unforeseeable circumstances arose which necessitated his using the money for other things. At his trial the debtor consistently testified that he always had the intent to repay the loan. In denying discharge, the court found that the evidence presented on the record established that the "unforeseeable circumstances" were not at all unforeseeable and the debtor had to have known.

Here, while Mr. DeCastro admitted that he used the loan proceeds to pay rent and other expenses, there was no evidence presented as to when those debts arose or the amount of those debts. So the court cannot weigh the evidence to infer intent. Likewise, it was admitted that a gambling debt arose after the giving of the $10,000 Loan but no evidence was submitted as to the extent and existence of the gambling debt at the time of the $10,000 Loan or how that debt related to Mr. DeCastro's intent at the time of the loan, so again, the court cannot infer intent.

There simply is nothing in the record to support that Mr. DeCastro made knowingly or recklessly false representations at the time he obtained the $10,000 Loan. Likewise, nothing was presented that shows that at the time of the loan Mr. DeCastro exhibited conduct intended to create and foster a false impression. As section 523(a) is to be strictly construed against creditors and liberally construed in favor of debtors, In re Cohn, 54 F.3d 1108, 1113 (3d Cir.1995), and the court believes, upon considering a totality of the circumstances, that Ms. Renella has not met her burden by a preponderance of the evidence that Mr. DeCastro, *at the time of* the $10,000 Loan, had the requisite intent to deceive Ms. Renella, her claim for nondischargeability under section 523(a)(2)(A) as it relates to the $10,000 Loan will be denied.

---

[5] Likewise, the other cases cited by Ms. Renella are distinguishable from this case.

### 2. The $1,900 Loan

Mr. DeCastro asked to borrow $1,900 from Ms. Renella to pay fees associated with PTI. Ms. Renella testified that she lent him the $1,900 in cash to pay those fees. Mr. DeCastro testified, without challenge, that he paid those fees. No evidence was submitted to refute Mr. DeCastro's testimony. As such, it is impossible for the court to determine how the $1,900 Loan was obtained through any false representation or false pretense by Mr. DeCastro. Absent any evidence that the $1,900 Loan was not used for its intended purpose, there can be no material misrepresentation. Consequently, the failure to prove one of the five elements under section 523(a)(2)(A) is fatal to Ms. Renella's nondischargeability case. *See Reynolds*, 221 B.R. 828, 834. Accordingly, Ms. Renella's claim for nondischargeability under section 523(a)(2)(A) as it relates to the $1,900 Loan is denied.

### 3. The $5,000 Loan

The court is troubled by the $5,000 Loan. Mr. DeCastro's testimony that he does not recall the purpose of the loan lacks credibility, when the email chain is absolutely clear on what Mr. DeCastro intended to represent to Ms. Renella as to the purpose of loan. Mr. DeCastro's explanations at trial as to why he would pay Damien with the proceeds were unbelievable. In his attempt to obtain the $5,000 Loan, Mr. DeCastro was clearly taking advantage of his relationship with Chrissy and/or Ms. Renella. But for his relationship with Chrissy, Ms. Renella would not have loaned him the money. His attempts to surreptitiously obtain loans from other members of the family under familiar circumstances does not sit well with the court.

For all that, there is a dispute as to whether the $5,000 Loan was even made. While Ms. Renella confidently testified and gave explicit and meticulous details on how the proceeds for the $5,000 Loan were derived, the fact of the matter is, there is no direct proof – only a self-serving check book ledger which does not evidence an actual payment to Mr. DeCastro. There is no record of a receipt of the funds by DeCastro. With Ms. Renella's discontent for Mr. DeCastro at the time of the $5,000 Loan, as well as his failure to abide by her understanding of the terms of or pay back the $10,000 Loan, it seems illogical not to keep a record of the transaction other than her checkbook ledger. In addition, the court is at a loss as to why Ms. Renella, after going through hiring a private investigator to locate Mr. Renella and having been taken advantage of by him three times, would fail to seek the full amount of the debt owed, i.e., $16,900 ($10,000 Loan + $1,900 Loan + $5,000 Loan). The Settlement Stipulation filed with the Florida County Court was for $13,900. According to Ms. Renella, in May of 2007, a total of $16,900. So why the difference? Ms. Renella claims that her attorney in Florida failed to include $3,000 as part of the cash payment given by her to Mr. DeCastro and that is what makes up the difference. But Ms. Renella signed the Settlement Stipulation *herself*. *See* Doc. 9. She had the numbers in front of her. She has shown the court that she is sophisticated and meticulous. It does not make sense that after aggressively pursuing Mr. DeCastro, Ms. Renella would have made a $3,000 mistake.

What is more, when no payments were made under the Settlement Stipulation a judgment was sought. But despite being owed $16,900, the judgment was for only $16,400? The numbers simply do not add up. The court requested a copy of what was submitted to the County Court in Florida evidencing, *inter alia*, the $5,000 Loan. It received the Settlement Stipulation only. The

only numbers actually confirmed were the $10,000 Loan and the $1,900 Loan. Consequently, the court does not have sufficient evidence to demonstrate that Mr. DeCastro actually obtained the $5,000 Loan from Ms. Renella.

Even if the court was persuaded that Mr. DeCastro obtained the $5,000 Loan, the court is not convinced that Ms. Renella justifiably relied on Mr. DeCastro's representation. Justifiable reliance is determined by a subjective standard. *See Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437 (1995). With regard to a determination of whether someone justifiably relied on a representation, the court in *In re Santos*, 304 B.R. 639 (Bankr. D.N.J. 2004) noted:

> the purported victim of a misrepresentation is required to assess that representation in light of his particular knowledge or experience in the circumstances of the case:
>
>> [J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and . . . '[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'
>
> *Id.* at 71–72, 116 S. Ct. 437 (quoting W. Prosser, Law of Torts § 108, p. 718) (4th ed. 1971) (the edition available in 1978 when the Bankruptcy Code was promulgated). The treatise continues: "The matter seems to turn upon an individual standard of a plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *Id.* at 72, 116 S. Ct. 437 (quoting Prosser, *supra*, § 108, p. 717).

304 B.R. at 667 (citing *Field v. Mans*, 516 U.S. 59).

Applying the justifiable reliance standard, the court cannot find that Ms. Renella could have justifiably relied on a representation made by Mr. DeCastro in connection with the $5,000 Loan. Ms. Renella impressed the court as a strong, very confident, tough and sophisticated business person. At the time of this alleged loan, she did not want Mr. DeCastro and Chrissy to get back together again. She had a distaste for him. She made her feelings known. Yet despite her business acumen, intelligence and dislike/distrust for Mr. DeCastro, and having previously been taken by him on the $10,000 Loan, she gave him cash, with no records, no trace, and no witness. Her reliance cannot be justified when considering her history with Mr. DeCastro.

Ms. Renella also claims that she made the $5,000 Loan to Mr. DeCastro because she was fearful that Mr. DeCastro's financial situation would put her niece in danger. But Mr. DeCastro's May 29, 2006 email to Ms. Renella, he assured her that "I am, however, in no trouble nor in danger of any prosecution of any kind," and "My debt is legitimate and I am certainly in no danger of being hurt." In addition, Mr. DeCastro represented that the majority of the proceeds

would be going to Damien and Chrissy so the court is at a loss as to why Chrissy was in danger. Further, Ms. Renella testified that she was not actually aware of the type of debt Mr. DeCastro had or whether Mr. DeCastro's gambling debt was legitimate and legal. Therefore, it is not clear that Ms. Renella's fears were rational supporting justifiable reliance.

Finally, while the questioning of Mr. DeCastro elicited responses that suggested a scheme, there was simply no evidence submitted that demonstrated that such a scheme existed.

As a failure to prove any one of the five elements is fatal to the creditor's nondischargeability case, *Reynolds*, 221 B.R. 828, 834, Ms. Renella's claim for nondischargeability of the $5,000 Loan under section 523(a)(2)(A) must be denied.

### B. Nondischargeability under section 523(a)(6)

The court indicated during the trial that Ms. Renella had not met her burden with regard to her claims under section 523(a)(6). Ms. Renella did not address section 523(a)(6) in her post trial submission. Despite that, the court will address the argument. Section 523(a)(6) provides that a discharge under section 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). As the court in *Jersey Cent. Power & Light v. Breslow*, No. 12-CV-05425 FLW, 2013 WL 632124, at *2 (D.N.J. Feb. 20, 2013) noted:

> Injury is "willful and malicious" within the meaning of § 523(a)(6) when an actor purposefully inflicts the injury or acts in such a manner that he is substantially certain that injury will result. *In re Conte*, 33 F.3d 303, 307 (3d Cir.1994). Further, non-dischargeability pursuant to § 523(a)(6) requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *In re Conner*, 302 B.R. 509, 514 (Bankr.W.D.Pa.2003) ("The phrase 'willful and malicious' modifies the word 'injury'. This implies that § 523(a)(6) requires a deliberate or intentional injury, not a deliberate or intentional act that merely happens to result in injury." (citing *Kawaauhau, supra*, 523 U.S. at 61)). Put differently, "[d]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau, supra*, 523 U.S. at 64.

*Breslow*, 2013 WL 632124, at *2. "[T]he Bankruptcy Code requires at least a deliberate action that is substantially certain to produce harm." *In re Conte*, 33 F.3d 303, 309 (3d Cir. 1994).

There is insufficient evidence to demonstrate that the damages incurred were based on Mr. DeCastro's willful and malicious conduct. There was no deliberate or intentional injury to Ms. Renella that satisfies her burden under section 523(a)(6). Indeed, for the reasons set forth on the record on June 3, 2015, the court expressed concerns about whether the burden was met at all. Mere reckless or negligent conduct is not enough and the court is unpersuaded by the evidence presented that Mr. DeCastro willfully and maliciously inflicted the injury upon Ms. Renella. As "courts must narrowly construe the discharge exceptions in § 523(a) in favor of the

debtor", *Breslow*, 2013 WL 632124, at *2, the court concludes that Ms. Renella has not met her burden under section 523(a)(6).

More to the point, Ms. Renella's claim under section 523(a)(6) centers around the theory of conversion. *See* Complaint, ¶¶ 35-38. A plaintiff alleging conversion as the basis for nondischargeability under section 523(a)(6) must first establish that conversion has occurred under New Jersey law, and then that the conversion was willful and malicious. *Pfeiffer*, 2011 WL 1045355, at *5. New Jersey law provides for conversion as follows:

> Conversion is the intentional exercise of dominion or control over personal property that seriously interferes with the right of another to control it. *See Mueller v. Tech. Devices Corp.*, 8 N.J. 201, 207 (1951); *see also Commercial Ins. Co. v. Apgar*, 111 N.J. Super. 108, 114, 267 A.2d 559 (Law Div. 1970); Restatement (Second) of Torts § 222A(1) (2007). "The essence of a conversion claim is that one party exercises the right of ownership over property belonging to another **without that person's permission.**" *Boccone v. Levinson*, No. 04-3871, 2006 U.S. Dist. LEXIS 94475, *19-20 (D.N.J. Dec. 26, 2006). To prove a claim for conversion, a plaintiff must prove "(1) that the alleged offender assumed and exercised the right of ownership over the party's goods or chattels without permission, and (2) excluded the owner from exercising dominion over them." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F.Supp.2d 543, 576 (D.N.J.) *aff'd*, 342 F.3d 191 (3d Cir. 2003) (citing *Barco Auto Leasing Corp. v. Holt*, 228 N.J. Super. 77, 83 (App. Div. 1988)); *Woodside v. Adams*, 40 N.J.L. 417 (Sup. Ct. 1878).

*Pollen v. Comer*, No. CIV.05 1656 JBS, 2007 WL 1876489, at *11 (D.N.J. June 27, 2007) (emphasis added).

Ms. Renella claims that Mr. DeCastro converted her property and therefore, section 523(a)(6) has been met. But, conversion is not *per se* willful and malicious for purposes of section 523(a)(6). *Pfeiffer v. Wulster*, No. 09-13388 MBK, 2011 WL 1045355, at *5 (Bankr. D.N.J. Mar. 17, 2011) *aff'd sub nom, In re Wulster*, No. ADV 09-2015 MBK, 2012 WL 589564 (D.N.J. Feb. 22, 2012); *In re Danese*, No. 12-11328 MBK, 2013 WL 1163780, at *2 (Bankr. D.N.J. Mar. 20, 2013) (stating that state court judgment for conversion is not enough to find that debtor intended to injure the plaintiff). A conversion may be "'innocent or technical, an unauthorized assumption of dominion without willfulness or malice.'" *Danese*, 2013 WL 1163780, at *2 (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934)).

The key for the court to a finding of conversion under section 523(a)(6) is whether something was taken without permission. Here, Ms. Renella knowingly and willingly loaned monies to Mr. DeCastro. He did not acquire these funds without her permission. As Ms. Renella cannot satisfy a necessary element for a finding of conversion under section 523(a)(6), her claim for nondischargeability under section 523(a)(6) will be denied.

## CONCLUSION

Because the court concludes that Ms. Renella has not met her burden to prove by the preponderance of the evidence that her claims should be excepted from discharge under sections 523(a)(2)(A) and 523(a)(6), Ms. Renella's claims will be denied.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: November 25, 2015